UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK
------------------------------------------------------------ X

UNITED STATES OF AMERICA            :

                                               :

                 -v.-

                                             :     22 Cr. 192 (JSR)

ANDREW DONE,
                                             :

       Defendant.

                                             :
------------------------------------------------------------ X

**SENTENCING MEMORANDUM FOR THE DEFENDANT ANDREW DONE**

 

John A. Diaz, Esq.
DIAZ & MOSKOWITZ, PLLC
225 Broadway, Suite 715
New York, New York 10007
(212) 227-8208



# DIAZ & MOSKOWITZ, PLLC

Attorneys at Law

**John A. Diaz, Esq.** **johnadiazlaw@gmail.com** **www.dmlawny.com**

Garden City Office:
1225 Franklin Avenue
Suite 325
Garden City, NY 11530
(516) 992-3496
(516) 686-6444

New York Office:
225 Broadway
Suite 715
New York, NY 10007
(212) 227-8208
Fax (212) 566-8165

February 10, 2023

**VIA ECF & EMAIL**
The Honorable Jed S. Rakoff
United States District Court Judge
Southern District of New York
United States Courthouse
500 Pearl Street
New York, NY 10007

**Re: *United States v. Andrew Done,* 22 CR 192 (JSR)**

Dear Judge Rakoff:

We are the attorneys for Andrew Done, having been appointed pursuant to the provisions of the Criminal Justice Act (CJA). Please consider the following in the Court's determination of an appropriate sentence, serving the interests of justice and sentencing goals of 18 U.S.C. § 3553(a).

## Introduction

As a young Andrew Done sat in the back seat of his grandfather's car, he recalled trembling with excitement and happiness. He described not understanding at the time why he was crying if he was feeling happy. As his grandfather drove away, he recalled turning around in his seat to look back at his family waving at him. He waved back at his relatives as they stood in front of the house he shared with them: a two-bedroom house made up of wooden planks, a zinc roof, cement floors and no indoor plumbing. The home, along with the others in his town, only had several hours of

electricity pers day, usually in the early morning.[1] Hurricane George had devasted the island several years prior and the small rural town in the Dominican Republic had yet to recover. Andrew was on his way to meet with his older brother and mother, whom he hadn't seen in a long period of time, and then he was boarding a plane to New York City to start a new life. As his grandfather drove through the gravel and dirt roads, Andrew daydreamed in the back seat about what life in New York City would be like and believing that anything had to be better than were he had just been.

Andrew was six years old when his mother's petitions for a visa for him and his older brother Caesar were approved, which allowed them to travel to New York to be with her. When Andrew was two, his mother, Miledi Done, obtained a visa and moved to the Bronx in order to work, leaving Andrew and his brother in the care of relatives. The family and extended family were of extremely limited resources and could not afford to care for both siblings and Miledi, who was 24 years old at the time, was forced to separate the brothers. Andrew lived with his paternal grandmother, while his brother went to live with cousins. Although they were both left behind, they did not see each other often as they lived in different parts of the island. Miledi immediately began working in New York and would send money for the care of Andrew and his brother. Andrew's father was lucky to have obtained employment with a construction firm that was building resort hotels on the other side of the Island in Punta Cana. Unfortunately, this meant that Andrew's father was gone from the home for most of the time that Andrew resided in the Dominican Republic.

Andrew desperately wanted to be with his mother and brother again and was eager to escape the circumstances he was leaving behind. At the age of 6, Andrew had yet to be diagnosed with Schizophrenia and his elderly grandmother who was caring for him had an extremely hard time raising him during those years. Without treatment or the specialized training necessary to care for a child with special needs, his grandmother and the six other relatives with whom he shared the two-bedroom shack would become easily frustrated with him and resort to excessive corporal punishment. As he sat in the back seat of his grandfather's car, he could not have imagined what the future had in store for him and his family. Within the course of a decade after he first stepped off the plane at JFK airport, Andrew found himself going back and forth from the Dominican Republic and New York City as his mother and family struggled to care for him. Andrew was subjected to frequent excessive corporal punishment, archaic behavioral treatment such as electroshock therapy, and was even given an adult relative's Schizophrenia medication as a child without prescription. While in New York City, his mother and brother experienced evictions and periods of extreme poverty. Although teachers described Andrew as a "good" kid and a "rule follower" that dreamed of being a police officer, he struggled immensely in school and was eventually deemed to have an IQ of just 60. As the years went on, the family endured financial hardships, Miledi was arrested for prostitution, and Andrew and his bother Caesar took to the streets. As of the day of this writing, both bothers are currently in prison awaiting sentencing on separate, unrelated murder cases.

[1] PSR ¶ 161.

Not surprisingly, Andrew's school, medical and psychological records, which number hundreds of pages, are replete with evidence of Andrew's limitations in adaptive functioning. These records, and thorough interviews with family members, form the basis of this submission, and tell the story of a child who was diagnosed as intellectually disabled at the age of twelve (12); has been hospitalized several times for depression, anxiety and adjustment disorder; was treated with electroshock therapy in the Dominican Republic, and; was administered unprescribed psychotropic medications by his mother. In addition to his struggles in school, he was bullied by other classmates and felt deep embarrassment and shame for being in special education classes.

Nevertheless, Andrew remains a young person of extraordinary promise and potential, and deserving of some leniency in the face of the serious charge upon which he has accepted responsibility and pleaded guilty. The information contained herein is not meant to denigrate the seriousness of the offense, nor the losses likely felt by the relatives of the victim. Indeed, it is well-established that mitigation evidence is not permitted as an excuse or justification for engaging in criminal conduct, but rather as mitigation in the length of sentence or punishment to be imposed as a result of that criminal conduct. *See, Lockett v. Ohio*, 438 U. S. 586 (1978), *Abdul Kabir v. Quarterman*, 550 U.S. 233, 246 (2007); *See also*, 18 U.S.C. §3661 and 21 U.S.C. § 859.

On November 17, 2022, Andrew pleaded guilty to Count One of the above-referenced indictment which charged him with participating in a racketeering conspiracy which resulted in the fatal shooting of another person. He is scheduled to be sentenced by Your Honor on February 17, 2023, and this memorandum is submitted to paint a picture of the promising young man that this Court will be sentencing and to provide information to assist this Court in fashioning a sentence "sufficient but not greater than necessary" to achieve the statutory purposes of punishment, as required by 18 U.S.C. § 3553(a) in light of *United States v. Booker*, 543 U.S. 220 (2005).

Andrew respectfully requests that this Court consider his difficult childhood, troubled background and numerous good character traits which warrant imposition of a sentence substantially below advisory guideline range, an appropriate sentence satisfying the objectives embodied in *Booker* and § 3553(a).

## Background

Andrew was born on December 8, 1998, in Santo Domingo, Dominican Republic to Miledi Done and Cesar Santana Ventura. Just a couple of months before Andrew was born, Hurricane George made landfall in the Dominican Republic, devastating the country with 120 mph winds and nearly 10 hours of heavy rain. It was late September 1998 and Andrew's mom, Miledi, was in her seventh month of pregnancy; she was home with her then-four (4) year-old son Cesar when the storm hit. The family didn't expect the hurricane to be so bad and had decided to stay in their home on the outskirts of Santo Domingo. But as the winds and rains whipped their tiny home, Miledi realized what a big miscalculation that had been shortly after her sons' father, Antonio, had left for work. The electricity went out, the phone stopped working, and all she could do at that point was hope that Antonio could rescue her before it was too late. By the time he pulled up in a taxi, parts of the roof had been torn off and she was hyperventilating from anxiety and asthma, holding on to her son Cesar with one hand and to whatever she could grab with the other. She had

no way of protecting her third-trimester stomach from the falls she suffered as she battled the wind and rain inside her house, wading through filthy hip-high water and trying to dodge the debris falling all around her. Antonio shoved her and Cesar into the backseat of the car and slammed the door shut before the wind could rip it off its hinges. Miledi fell belly first into the back of the car, immediately feeling the pain of the impact. The rest of the long ride to higher ground was spent with her body pressed up against the interior of the car, getting thrashed around when it swerved or a gust of wind shook it.

When they got to a relative's house, she checked her belly and saw the black-and-blue bruises of the many blows she suffered in the hurricane. Miledi couldn't get to a doctor because so many roads were destroyed, and any hospital that was still standing was packed with people severely injured in the storm. She cried and prayed for her unborn baby to be okay. With little education and limited prenatal care, she didn't know what type of impact the experience with the hurricane could have on her baby. Since then, clinical studies have linked pregnant women's exposure to events like natural disasters to their children's psychiatric conditions and altered neurodevelopment, including increased risk for affective disorders and reduced cognitive ability.[2]

Additionally, during her pregnancy with Andrew, and for much of her life, Miledi spent extended periods of time visiting family in Haina, Dominican Republic, also known as Bajos de Haina, which has been referred to as the 'Dominican Chernobyl'. A community near an abandoned lead-acid battery recycling smelter, nearly its entire population shows signs of lead poisoning. In 2000, the Dominican Secretary of Environment and Natural Resources identified Haina as a national hotspot of significant concern. Indeed, according to the United Nations, its population was considered to have the highest level of lead contamination in the world, and its entire population carries indications of lead poisoning. The health effects of lead poisoning are both acute and chronic and are particularly severe on children. These effects include: Neurological damage, reduced IQ, anemia, nerve disorders, muscle and joint pain, loss of memory and concentration, infertility, increased blood pressure and chronic headaches and weakness. At high concentrations lead poisoning can cause death. When Andrew was born in early December 1998, there were no immediately noticeable effects of the trauma he suffered in utero during the hurricane or as a result of exposure to lead. However, when Andrew was a few months old, Miledi started to notice that he was very withdrawn, even as a baby, and particularly when she compared him to her older son, Cesar. Andrew often seemed to be lost in thought, played alone or just sat there. A few years later, when he was enrolled in a local pre-school, she heard from teachers that Andrew was slower than the other kids, that many times he drifted off and was not keeping up with the rest of the class.

---

[2] New Research Shows Children Exposed to Natural Disasters in the Womb Have Higher Rates of Developmental Psychopathology in a Sex-Specific Manner, Mount Sinai (Sept. 21, 2022) https://www.mountsinai.org/about/newsroom/2022/new-research-shows-children-exposed-to-natural-disasters-in-the-womb-have-higher-rates-of-developmental-psychopathology-in-a-sex-specific-manner.

Early Years

Miledis's petition for a visa to the United States was approved shortly after Andrew's birth, requiring her to make a painful decision; stay with her children or lose her opportunity to work in the United States and provide for her family. She chose to emigrate to the United States in the hopes that she would be able to obtain a better life for her and her young children. When Andrew was less than two (2) years old, his mother left the Dominican Republic and he was left in the care of his paternal grandmother, Maria Ventura, while his brother lived with their father and their father's aunt.[3] Andrew's aunt had children of her own and, with limited resources, was unable to take both Andrew and his brother.[4] During this time, Andrew's mother visited when she could and sent money back to the Dominican Republic for his and his brother's care.[5] Andrew's father also visited Andrew when he was able but his work often required him to be away from the home for three-to-four month periods.[6] Fortunately, his older brother visited him often, although there were periods where he would not see him for months.[7] Andrew always looked forward to his brother's visits and for that short period of time, felt like he was home again.

Andrew's paternal grandmother was a stern and old-fashioned woman who quickly became overwhelmed at having to care for Andrew, especially as he struggled in school. She was a screamer who lost her patience easily and was quick to grab a belt to discipline Andrew. Andrew's dad would come visit on weekends, or monthly, or whenever he could, sometimes going several months without seeing him, however, when he was around, he was as much of a strict disciplinarian as his mother. His grandmother rarely showed him affection and Andrew recalled being "beat" and forced to kneel on raw rice for misbehaving.[8] Fortunately, due to her age, Andrew's grandmother was unable to perform the daily routines required to care for a young child, such as school drop off and pick up and Andrew only lived with his grandmother for approximately one year and then spent the remainder of his time at his mother's cousin's home.[9]

The home was a small, two-bedroom dwelling made of wooden planks, a zinc roof, cement floors, and had no indoor plumbing.[10] Seven people were crammed into the tiny house and, although he was provided with food, Andrew used an outhouse for a bathroom and had to walk to a river to obtain jugs of water to use as their source of water.[11] They were only provided with electricity for three hours in the morning.[12] In addition to the daily hardships Andrew and his family endured, Andrew also recalled that, while living with his cousin, his uncle who lived at the home with him, sexually abused him.[13] Andrew remembers his uncle touching him inappropriately

---

[3] PSR ¶ 159.
[4] *Id.*
[5] *Id.*
[6] *Id.*
[7] *Id.*
[8] PSR ¶ 160.
[9] *Id.*
[10] PSR ¶ 161.
[11] *Id.*
[12] *Id.*
[13] *Id.*

and almost penetrating him.[14]  He told his father about the incident and his father subsequently removed his uncle from the home, but no charges were filed against him.[15]

In the summer of 2005, when Andrew was six, Miledi brought him and his brother to live with her in the Bronx. Their dad stayed in the Dominican Republic and was unable to help support them financially after they moved. Although Miledi had been in the Bronx for a few years prior to the arrival of her boys, her dreams of success had not materialized. She had a hard time getting work —she was unskilled, unable to speak English and functionally illiterate in her own language, having dropped out of school in the seventh grade.



*Andrew, age 6, and his mom on their way to the Bronx from the airport after he moved to the US in 2005; this is Andrew's first picture in the US.*

Since Miledi left the Dominican Republic, she bounced around from job to job, sporadically making a living cleaning houses, picking up kids from school, babysitting, helping at a cousin's restaurant, mixing hair dyes at a salon, and sweeping up after construction workers. Some of these jobs worsened her asthma. Money was always tight and she often had to borrow cash to support herself and her two children. The financial difficulties that Andrew's family faced were prevalent in the area where he grew up in the University Heights section of the Bronx, where Census figures place the poverty rate at more than twice the national average.[16] In the Bronx, Miledi and Andrew lived in a two-bedroom apartment, housing twelve (12) people including his maternal grandparents, Aunt Delma and her daughters, Uncle Franklyn and his wife and kids, and his mom and brother. The grandparents had their own bedroom; everyone else spread out all over the apartment. Sometimes Andrew slept in one bed with his mom and brother, other times with his cousins, or on the couch, or wherever he could find a place to lay his head at night.

---

[14] *Id.*
[15] *Id.*
[16] United States Census, 10468 (last visited Feb. 2, 2023) https://data.census.gov/profile/ZCTA5_10468?g=860XX00US10468.



*Andrew, third from left, sharing a bed with his cousins in the Bronx.*

Although the family was poor, Andrew felt lucky to be reunited with his mother in the greatest city in the world. Miledi did her best to provide Andrew and his brother with the basic necessities and he always felt loved and supported by his mother. Although his father was unable to send financial support, Andrew remembers receiving care packages from his father full of snacks from their native country, which always made Andrew feel close to his roots.[17] Unfortunately, when Andrew was eight years old, he and his family were evicted from their home for failure to pay rent and had to move into his maternal grandmother's basement.[18] When he was nine years old, Andrew acquired citizenship through his mother.[19] Miledi eventually went on government assistance and although she denied it when asked by the defense mitigation expert, our investigation revealed that she had a prior arrest for prostitution.

Andrew's family's financial struggles and instability stressed him and compounded his troubles at school. He consistently got low grades, had a hard time learning English and quickly became an easy target for bullying by American-born students who picked on him for being a recent immigrant. They would call him homophobic slurs, push him in the hallway and chase him after school. Just a few months after Andrew landed in the United Stated, Miledi was scrambling to raise two children by herself; work and money were even more scarce now that she had to think about childcare and school pick-up and drop-off times. Less than a year after Andrew landed in New York, Miledi decided that the best option was to send him back to the Dominican Republic and for his brother Cesar to stay with her in the Bronx. Being the one chosen to endure another separation from his mother was profoundly traumatic for Andrew. When he returned to the Dominican Republic in 2006, at age seven (7), Andrew again went to live with his ill-tempered grandmother and had to repeat the first grade, this time at the Centro Educativo Carmen Maria in his old neighborhood of Antillano.

---

[17] PSR ¶ 163.
[18] PSR ¶ 164.
[19] PSR ¶ 162.



*Andrew, age 8, attending school in the Dominican Republic in 2007.*

This would be the first of several one-way-tickets back to the Dominican Republic for Andrew throughout his childhood and adolescence, and the start of a harmful pattern of family separation and disruption to his education and mental health treatment. School records show that starting at age seven, Andrew would regularly fly back to the Dominican Republic. He remembers often traveling alone in the care of a flight attendant. Throughout his elementary school years, he would spend several months living with his grandmother or with relatives he barely knew and attending new schools. His dad was still working far away from home and Andrew no longer had the comfort of his older brother's company —Cesar would stay with his mom in the Bronx while Andrew was sent away.

When Andrew was sent to live in the Dominican Republic, he would bounce around from house to house. When things got too bad at grandma's house, he would be sent to live with any relative willing to take him in. There was little supervision. One time when Andrew was about eight (8) years old he went out at night to get avocados and was hit by a motorcycle; he spent several days at the hospital. Another hospitalization happened around this time when he got dengue and had to be hospitalized for several weeks. Mom was in the United States, dad was away in the resort areas working, and during these hospital stays he was cared for by whoever was around. For a while, he was sent to live with cousin Adelgisa Montes de Oca, who lived close to the polluted town on of Haina. Like other relatives, she had no qualms about physical punishment, which in addition to hitting him also included making Andrew kneel for long periods of time. One particularly bad punishment was when he went on the roof of her house and started hitting the electric cables with a stick, causing a block-wide blackout that took several days to repair.

During one of these long stays in the Dominican Republic when he was in elementary school, he was taken to a clinic to get electroshock treatment. Andrew's dad was away working when he got a call from his cousin Juan Ventura saying that Andrew was "frenetic" and that Juan and his stepfather had decided to take Andrew to a psychiatric hospital known as "El 28." Andrew has memories of being taken to a medical center and getting injected with something before being strapped down and given what he refers to as "the currents." He would spend the night at the

hospital and leave feeling dazed and confused. Miledi was in the United States at the time, unaware that her son was getting electroshock therapy. Andrew would tell her that he hadn't been around to receive her calls because he was getting "the currents." Miledi remembers his grandmother calling Andrew a liar in the background and getting on the phone to say that Andrew was messing with the electric outlets and got shocked by electricity.

Around the fall of 2007, Miledi brought Andrew back to New York only to send him back again in 2008, where school records show he was transferred to the Centro Educativo Decrossory in the Dominican Republic to start second grade there; he was almost ten at the time and already several years behind. In late 2009, Andrew was back in the New York. The years-long cycle of instability, separation from family and general dysfunction deepened Andrew's problems. His report card from this time period, when he was in the 4th grade, shows grades below standard in most areas.

<u>Difficulties in School</u>

Andrew has always struggled in school and whether it was in the Dominican Republic or the Bronx, he was unable to focus on the material for extended periods of time nor retain information. After arriving in New York City, Andrew's mother quickly enrolled him in public school. School was difficult for Andrew – he did not speak English and was often behind all of the other students in his classes. When he was twelve (12) years old, he was administered an IQ test and his full-scale IQ score was sixty (60), putting him in the Extremely Low range of intellectual ability. The test was made up of four sections and Andrew scored in the Extremely Low range in three of the sections. The report concluded: "These are areas of pronounced concern because they are related to learning and achievement. Cognitive deficits are noted in the areas of memory, attention, retaining/recalling information, sequencing, organization and processing speed." Further, the evaluation results noted that:

> Being in the Extremely Low range of intellectual functioning means that Andrew may find it difficult to keep up with other children when thinking and reasoning skills are needed. Andrew has great difficulty on tasks that require him to scan symbols and make judgments about them. These tasks measure his skills in speed of mental problem solving, attention and eye-hand coordination. This skill may be important to his development in reading and ability to think quickly in general.

As a result of his score, Andrew received test accommodations including, extended time, revised test formats and a separate room. He is classified as having a learning disability and was eligible to receive special education classes. His reading tests results placed him below kindergarten level when he was in the 6th grade and he recognizes numbers but has trouble with basic math operations like addition and subtraction. Andrew's academic skills are in the very low range for his age group. A progress report for this IEP notes that he had made little progress in achieving various goals set for him by the school to catch up academically. Despite Andrew's tests results and low IQ, no behavioral intervention plan was recommended. In a January 2023 phone interview, Rosana Nin, a Spanish-speaking paraprofessional who worked with Andrew when he was in middle school, described him as barely able to read or write in either language in the 7th

grade. His behavior was described as "good," he did his homework yet continued to struggle academically.[20] He was always respectful of his peers and is a rule-follower.[21]

When Andrew was fourteen (14) years old, he was performing at a second-grade level in math and a first-grade level in writing, even though he was in the 7th grade. He is 4.5 years below grade level for computation and in problem solving, he is six years below grade level. Although he is a Spanish-dominant speaker, he still had low level verbal and written skills in Spanish, using a very simple sentence structure and limited vocabulary. In a vocational survey, Andrew expressed interest in becoming a police officer. He always did the best when he was involved in hands on activities.[22]

Being placed in special education classes made Andrew feel embarrassed and uncomfortable around his peers. Specifically, while in high school, an investigation was initiated by the New York City Administration for Children's Services (ACS) due to educational neglect from truancy.[23] Andrew's high school was racially divided which resulted in conflicts almost daily.[24] Unbeknownst to Andrew's mother, Andrew was skipping school out of fear of being beaten up.[25] On three separate occasions, Andrew was assault outside school property, including one time when he was hit in the head with a wooden bat.[26] The injuries he suffered as a result of these beatings only exacerbated his mental state and although his mother attempted to transfer him to another school, the other educational institutions were worse.[27] The bullying continued and the attacks got worse: his brother was no longer around that school and Andrew was regularly chased by groups of guys intent on giving him a beating; one time a bully came armed with iron knuckles. To keep himself safe, he started to skip school, a practice adopted by other bullied students who become truant as a way to escape their attackers. Years of being subjected to physical abuse at the hand of caretakers and bullies had taken a toll on him. When he started to develop panic attacks, his cousin Lorenzo gave Andrew Xanax to calm him down. The immediate effect was that Andrew's nerves relaxed, which his mother approved of without understanding the consequences of randomly giving controlled substances to a child without medical consent. The mother would at times also give him some of her medications, like Klonopin and sleeping pills, to make Andrew drowsy and keep him home.

As Andrew continued through his schooling, he remained in special education classes but always hid the fact that he does not understand because he was embarrassed. He started acting out and changing for the worse when he was 15 years old. His math was still as a first-grade level and he was about 6.5 years behind in computational level. However, he became more talkative to the point of being a distraction to other students. Andrew began skipping class and leaving the

---

[20] *See* Exhibit A – Letter from Mr. Jeremy Blynn
[21] *See* Exhibit B – Letter from Ms. Carty.
[22] *See* Exhibit C – Letter from Daniel Mozoub.
[23] PSR ¶ 165.
[24] *Id.*
[25] *Id.*
[26] *Id.*
[27] *Id.*

building with other classmates. It was noted that he was very shy when it comes to asking for help but seems to have "excellent" relationships with his peers and is respectful of the teacher's authority in the classroom. However, he still has "too many enemies and wanted to get out of school."[28] At this point, Andrew had joined the "Shooting Boys" gang in an effort to find a group of people who made him feel like he belonged. Andrew ended up dropping out of high school a few months into his freshman year. His high school transcript shows that he failed all his classes in the first term of his freshman year.

NYC Department of Education

**Grade 4 Report Card**

Student Name: ANDREW DONE
Student ID: 209394261

Report Period: 3 Date: 06-23-10
School Year: 09 - 10

School: P.S. 291
Principal: CARLOS VELEZ
Teacher: ELIZABETH MARTINEZ

| Reading — Performance Level (1-4) | 1st | 2nd | Final |
|---|---|---|---|
| Overall Grade | | 1 | 1 |
| Reads independently for sustained periods of time | | 1 | 1 |
| Reads aloud fluently with expression | | 1 | 1 |
| Shows evidence of understanding text | | 1 | 1 |

| Writing | 1st | 2nd | Final |
|---|---|---|---|
| Overall Grade | | 1 | 1 |
| Uses correct grammar and spelling | | 1 | [illegible] |
| Writes independently on a variety of topics | | 1 | 1 |
| Uses a wide range of vocabulary | | 1 | 1 |

| Listening and Speaking | 1st | 2nd | Final |
|---|---|---|---|
| Overall Grade | | 1 | 1 |
| Shares information and opinions in class discussions | | 1 | 1 |
| Listens respectfully and takes turns speaking | | 1 | 1 |
| Builds on the ideas of others in conversations | | 1 | 1 |

| Mathematics | 1st | 2nd | Final |
|---|---|---|---|
| Overall Grade | | 1 | 2 |
| Demonstrates an understanding of content | | 1 | 2 |
| Computes with accuracy and efficiency | | 1 | 2 |
| Solves problems and explains solutions and strategies | | 1 | 2 |

City Exam Results

Teacher Comments

| Science — Performance Level (1-4) | 1st | 2nd | Final |
|---|---|---|---|
| Overall Grade | | 1 | 1 |
| Demonstrates an understanding of content | | 1 | 1 |
| Demonstrates science skills and scientific thinking | | 1 | 1 |

| Social Studies | 1st | 2nd | Final |
|---|---|---|---|
| Overall Grade | | 1 | 1 |
| Demonstrates an understanding of content | | 1 | 1 |
| Demonstrates ability to apply social studies skills | | 1 | 1 |

| | 1st | 2nd | Final |
|---|---|---|---|
| ESL (English as a Second Language) | | 1 | 1 |
| Arts | | 2 | |
| Physical Education | | | |
| Technology | | 3 | 3 |
| Other: | | | |

| Personal and Social Growth | 1st | 2nd | Final |
|---|---|---|---|
| Demonstrates effort and completes homework | | 2 | 3 |
| Works and plays cooperatively with others | | 2 | 3 |
| Respects class and school rules | | 3 | 3 |

| | 1st | 2nd | Final |
|---|---|---|---|
| Days Absent | 0 | 4 | 2 |
| Days Late | 0 | 0 | 0 |

General Notice

Parent Signature: Melodis Done Date: 6-23-10

## Test Scores

**WISC-IV Spanish Test Scores**

| Scale | Score | |
|---|---|---|
| Verbal Comprehension (VCI) | 69 | Extremely Low |
| Perceptual Reasoning (PRI) | 59 | Extremely Low |
| Working Memory (WMI) | 83 | Low Average |
| Processing Speed (PSI) | 65 | Extremely Low |
| Full Scale (FSIQ) | 60 | Extremely Low |

[28] PSR ¶ 191.

Despite having endured so many obstacles at a young age, people who knew Andrew from this time period describe him in positive terms. His middle school math teacher, Jeremy Blynn, wrote that Andrew "was a student with some disabilities but he always tried his best…never malicious or disrespectful." In various DOE records, he is called a respectful student who participates when he is able to understand the lesson and that in group counseling sessions, the counselor observed that when other students in the group acted out, Andrew did not follow that behavior. It was also noted that he is very shy when it comes to asking for help but seems to have "excellent" relationships with his peers and is respectful of the teacher's authority in the classroom.

It is also noteworthy that although Andrew has always had difficulties in comprehension and learning, while incarcerated at the MDC, he has completed numerous courses, including: a 10-hour commercial driver's license course; a 120-hour conflict resolution course; a 12-hour business ethics course; a 12-hour leadership course; a 12-hour budgets and financial reports course; a 12-hour sales fundamental course; a 12-hour marketing basic course; a 12-hour business acumen course; a 12-hour entrepreneurship course; a 12-hour 10 soft skills course; a 12-hour basic bookkeeping course; a 12-hour developing creativity course; a 12-hour time management course; and a 5-hour card making course.[29]

Mental Health

Throughout his life, Andrew has experienced difficulties surrounding his mental and emotional health. When he was five years old, his grandmother took him to see a psychiatrist because he was being disruptive at school, jumping and climbing around and hitting his peers with sticks, and had difficulty sleeping.[30] The psychiatrist prescribed him medication to help him relax and sleep.[31] Subsequently, Andrew was diagnosed with schizophrenia, bipolar disorder, and depression, for which he was again prescribed medication.[32] Clinical notes from Fordham-Tremont Mental Health Center show that Andrew was seen in 2015 for depression and adjustment disorder. Treatment stopped because in 2016 Andrew was again sent to the Dominican Republic, where he had a such a severe psychiatric episode that he had to be hospitalized and injected with Valium. During that hospitalization, he was also injected intramuscularly with Xanax. He was prescribed Sertraline (which is used for depression, panic attacks and OCD)[33] and a pill known in the Dominican Republic as "Psicopina" (in the U.S. it is marketed as Seroquel and used to treat schizophrenia and bipolar disorder).[34]

Shortly after that hospitalization, Andrew's family decided to send him back to the Bronx. The result was that, once again, Andrew had to stop his mental health treatment. This time,

[29] PSR ¶ 194.
[30] PSR ¶ 178.
[31] *Id*.
[32] *Id*.
[33] *Sertraline HCL – Uses, Side Effects, and More*, WebMD (last visited Feb. 9, 2023) https://www.webmd.com/drugs/2/drug-1/sertraline-oral/details.
[34] *Quetiapine Fumarate – Uses, Side Effects, and More*, WebMD (last visited Feb. 9, 2023) https://www.webmd.com/drugs/2/drug-4689-8274/quetiapine-oral/quetiapine-oral/details.

returning to the Bronx also meant being around his cousin Lorenzo and other people willing to give him random pills to deal with his mental disorders and the trauma of past abuse and abandonment. At just eleven (11) years old, Andrew began experiencing visual and auditory hallucinations.[35] He did not understand what was going on and told his mother that he was scared. Andrew's mother had him undergo an evaluation and he was diagnosed with schizophrenia.[36] He was prescribed three medications, along with weekly counseling but in 2016, stopped going to counseling after he had to get a new therapist, who he did not find helpful.[37] However, he continued to take his medication, until approximately 2019, when he replaced his prescribed medication with illegal drugs.[38] Andrew found that the street drugs were more effective in controlling his symptoms.[39]

Around the same time that he began experiencing hallucinations, Andrew got into an argument with a classmate and attempted to commit suicide by trying to throw himself out of a third-floor window.[40] Fortunately, the school security guard was able to grab him before he could break the window.[41] As a result of this attempt, in conjunction with private therapy, Andrew also met with the school counselor on a weekly basis until he graduated middle school in 2013.[42]

After Andrew dropped out of school, he no longer had the structure that the school setting provided. A history of developmental impairments coupled with his inability to speak English made it difficult for Andrew to find stable work and get ahead. He ended up spending lots of time just hanging out with cousins, friends from the neighborhood and his older brother Cesar. A constant influence in Andrew's life, Cesar had been out of school and on the streets for a few years already when Andrew himself started to get in trouble after his 2016 hospitalization. Cesar is currently facing charges for a shooting in the Bronx in August 2022, which occurred while he was on parole.[43] Additionally, two days after his arrest in the instant case, Andrew again attempted suicide by cutting his arm and chest.[44] He was not hospitalized at the time but was placed on suicide watch for 17 days.[45] Andrew now meets with a staff psychologist at the MDC Brooklyn monthly and is taking three medications to treat schizophrenia and depression.[46]

---

[35] PSR ¶ 179.
[36] *Id*.
[37] *Id*.
[38] *Id*.
[39] *Id*.; Andrew is currently under psychiatric treatment at the MDC where he is prescribed Sertraline (anti-anxiety medication), Venlafaxine (treatment of depression), and Risperidone (treatment of schizophrenia).
[40] PSR ¶ 180.
[41] *Id*.
[42] *Id*.
[43] Peter Senzamici, Rocco Parascandola and Thomas Tracy, *Bronx Suspect Nabbed for Caught-On-Video Shooting of Teen Driver, Parents of Victim 'Cry Every Day,'* Daily News (Aug. 16, 2022) https://www.nydailynews.com/new-york/nyc-crime/ny-bronx-fatal-shooting-car-arrest-travis-griffiths-20220816-37pymdveangk3bz66iqvkhnori-story.html.
[44] PSR ¶ 181.
[45] *Id*.
[46] *Id*.

Hopes for the Future

Although Andrew has never been married, he has been romantically involved with Miguelina Enriquez since 2018.[47] They have one child together, an 18-month-old daughter, who is Andrew's pride and joy.[48] Ms. Enriquez is currently living in a shelter with the child but both are in good health and they communicate regularly with Andrew.[49] Andrew is focused in maintaining a relationship with his baby daughter [redacted] 18 months old, and with his girlfriend and daughter's mother, Ms. Henriquez. They met as teenagers in the Bronx and are still together six years later. Andrew calls her frequently to see how [redacted] is doing, making sure to stay present in his young daughter's life by phone and through letters. In one of these letters, shared by Miguelina, Andrew describes his dreams of raising his daughter, giving her a good education and moving away from the Bronx.[50] She also describes Andrew as a "crazy and nervous" person who always felt like no one loved him, despite having a good relationship with her, his mother, and his son.[51] She has also noticed signs of his mental illness in their time together and notes that he often lacked an appetite and woke up bored and disinterested.[52]

Andrew's family is "where his strength lies" and is what "inspires him to build a successful life."[53] He is a good person who is dedicated to becoming a better person and staying healthy for his future.[54] Andrew is a respectful and caring young man with a good heart who will help anyone in need.[55] He understands that he made a mistake and is looking forward to the day that he can once again be a daily presence in his son's life.[56] Throughout the course of the case, counsel would note that Andrew has always been polite, respectful and greeted his defense team with a big smile. In preparation for this submission Andrew revealed the story of how he still remembered how he felt riding in his grandfather's car to head to a new country and on the day, he first went to New York City. In a moment of self-reflection, Andrew stated he has a similar feeling as the one he had on that day, that no matter what happens, he is going to make a new start in his life. He is going to use this tragedy to become a better a person and since his incarceration, has availed himself of every course or program offered to him at the MDC. It is his hope that he will be released one day and have an opportunity to work as a truck driver and be a father to his daughter.

While in jail, Andrew has continued his quest to be a better person and to have a way to support his family when he is released. He has continued to take classes at the MDC and has attained various certificates. Andrew feels sad that he cannot be there to help raise and protect his son. Since Andrew's incarceration, Ms. Enriquez has lost her housing and had to move to a shelter

---

[47] PSR ¶ 167.
[48] PSR ¶ 168.
[49] PSR ¶¶ 167, 168.
[50] Exhibit D – Letter from Andrew to Miguelina.
[51] PSR ¶ 169.
[52] *Id*.
[53] Exhibit E – Letter from Antonio Santana.
[54] *See* Exhibit F – Letters from Arami, Elba Rymer, Jaylin De Jesus and Mabel Toribio.
[55] Exhibit G – Letter from Carlos Hidalgo; Exhibit H – Letters from Angelica Done, Karol Done, Odeida and Luis Done, Erick Montes de Oca, Angel Luis Caraballo, Julian Alonzo and Daisy Cruz, and Giselle De Jesus; Exhibit I – Letter from Yoelmy Sosa.
[56] *See* Exhibit J – Letters from Miguelina Enriquez and Miledis Done; *see also* Exhibit K – Letter from Justo Ventura.

in the Bronx. In December 2022, Ms. Enriquez was attacked with pepper spray while she did laundry with her son, an incident that greatly distressed Andrew. At the MDC, he is diligent about taking his medication and showing up to his appointments with the medical and psychological team. During his incarceration, he has dealt with suicidal thoughts and hallucinations, and now more than ever he understands the importance of keeping up with his mental health treatment. Like he tells Ms. Henriquez in the letters he writes from jail, decorated with stick figures and riddled with spelling mistakes, his hope is to return to his family after paying his debt to society and continue to improve himself.

**THE APPROPRIATE SENTENCE**

The Court is required to consider the factors set forth in Title 18 U.S.C. § 3553(a) and to impose a sentence that is both reasonable and "sufficient, but not greater than necessary, to comply with the purposes" reflected by the subsections of § 3553(a). Andrew is remorseful for his conduct and is apologetic for his participation in this crime. After a review of his life and circumstances, a sentence of 15 years imprisonment is appropriate, reasonable, and thus warranted in this case.

Pursuant to the plea agreement, the Government and Andrew agree that, following a multiple count adjustment pursuant to U.S.S.G. § 3D1.4(a), (b), and (c), Andrew's Combined Adjusted Offense Level is 44. Because the defendant was an organizer or leader of a criminal activity that involved five or more participants, or was otherwise extensive, the offense level is increased by four levels, pursuant to U.S.S.G. § 3B1.1(a). After a two-point reduction pursuant to U.S.S.G. § 3E1.1(a), and an additional one-point reduction pursuant to U.S.S.G. § 3E1.1(b) for acceptance of responsibility, Andrew's Total Offense Level is 45, with a Criminal History Category of II, resulting in an Applicable Guideline Range of life.

**1) The nature and circumstances of the offense and the history and characteristics of the defendant (18 U.S.C. § 3553 (a)(1));**

**a. Nature and circumstances of the offense:**

The charge to which Andrew pleaded guilty is an extremely serious offense and he accepts full responsibility for the poor decisions he made to become and remain involved in the instant conspiracy. He is truly remorseful for his actions, as evidenced by his guilty plea, and the time he has spent in pre-trial detention has given him time to reflect on his past and he realizes that his actions have greatly affected his family and his community.

Notably, Andrew is currently 24 years old and the indictment alleges actions that spanned from 2017 through 2022, when Andrew was 19 years old and 24 years old respectively. In addition to the numerous and severe mental problems Andrew suffers from, recent scientific studies have shown that underdevelopment of the human brain makes young adults more susceptible to engaging in risky behavior and becoming influenced by others. Specifically, the human brain does not fully develop until age 25, and the last part of the brain to develop is the prefrontal cortex,

which relates to judgment, forethought, impulse control, and other executive functions related to decision-making.[57] This explains why many young adults engage in risky behavior and fail to properly evaluate the long-term consequences of their actions the way that older adults do.[58] Andrew understands the severity and seriousness of his actions, and acknowledges that he often acted impulsively. However, his young age coupled with the circumstances of his childhood and teenage years leading up to his arrest reveal overwhelming psychosocial mitigating issues that should be considered in support of a below-guidelines sentence.

Andrew takes full responsibility for the role he played in the conspiracy and is not casting blame on others for his involvement. However, he has taken actions to make amends for his crimes by pleading guilty. It is clear that a sentence of 15 years imprisonment would be "sufficient, but not greater than necessary" to comply with the sentencing goals of 18 U.S.C. § 3553(a).

**b. History and characteristics of the defendant:**

As discussed at length above, Andrew had a difficult childhood. While still in his mother's womb he suffered severe trauma during a terrible earthquake and was exposed to toxic chemicals in an area known as the "Dominican Chernobyl" that undoubtedly affected his development. From there, he continued to struggle financially, emotionally, and mentally. When he was still young, his mother left him in the care of his grandmother while she immigrated to the United States. Because of his grandmother's age and inexperience with mental illness, she was not equipped to handle Andrew and often resulted to beating him and other forms of corporal punishment. After spending a year with his grandmother, Andrew moved in with a cousin and was sexually abused by an uncle. His life in the Dominican Republic was traumatic, to say the least. With limited resources, it was difficult for him to get the help and support he needed and he struggled immensely with his mental and emotional illnesses.

Andrew thought that moving with his mother to New York City would fix all of his problems and he was looking forward to a new adventure. Unfortunately, life in New York City proved to be difficult and Andrew struggled at school and struggled to maintain his emotions. He was placed in special education classes after being evaluated in the Extremely Low Range of intellectual functioning. Andrew was embarrassed at his lack of understanding and was often bullied as a result. This left him feeling alone and he turned to the Shooting Boys gang in an effort to find a place where he belonged.

Andrew's childhood can only be described as abusive, unstable, and beset by poverty. He struggled in almost every aspect of his life and, lacking role models at home and structure in

---

[57] *See Understanding the Teen Brain*, University of Rochester Medical Center, Health Encyclopedia, https://www.urmc.rochester.edu/encyclopedia/content.aspx?ContentTypeID=1&ContentID=3051 (last visited Aug. 31, 2022); *see also* Jesse Payne, *Change Your Brain, Change Your Life (Before 25)*, Psychology Today (August 7, 2014), https://www.psychologytoday.com/blog/the-author- speaks/201408/change-your- brain-change- your-life- 25

[58] *See A Teen's Brain Isn't Fully Developed Until Age 25*, Paradigm Treatment (Feb. 23, 2021) https://paradigmtreatment.com/teens-brain-fully-developed-age/; *see also* Arthur Allen, *Risky behavior by teens can be explained in part by how their brains change*, The Washington Post (September 1, 2014), https://www.washingtonpost.com/national/health-science/risky-behavior-by-teens-can-be-explained-in-part-by-how-their-brains-change/2014/08/29/28405df0-27d2-11e4-8593-da634b334390_story.html?utm_term=.b6431a16ca72

school, Andrew turned to peer networks for socialization and education. Nevertheless, Andrew is a good person who is always looking to help others in need and is always respectful to those around him. Andrew's personal history, mental illness, and characteristics paved the way for his involvement in this instant offense. While his background does not excuse his actions, nor in any way diminish the seriousness of his conduct, it provides substantial mitigation in determining the appropriate sentence that serves the ends of justice. He is remorseful for his actions and has taken responsibility by pleading guilty.

**2) The need for the sentence imposed to: reflect the seriousness of the offense, promote respect for the law, provide just punishment for the offense, afford adequate deterrence to criminal conduct and to protect the public from further crimes of the defendant (18 U.S.C. § 3553(a)(2)(A)-(C));**

Andrew appreciates the serious nature of his crimes and is remorseful for his conduct. Sentencing Andrew to 15 years imprisonment will provide sufficient punishment for the offense and protect the public from further crimes of the defendant. In addition to the sentence he receives, Andrew is also going to suffer the collateral consequences of this conviction for the rest of his life. He will carry with him the stain of being a federally convicted felon and this will undoubtedly limit his prospects and opportunities for employment and continued education. He will not be allowed to vote in certain states or obtain licenses needed for many jobs and will face restrictions on housing and public benefits, such as student loans. These consequences "serve no useful function other than to punish criminal defendants after they have completed their court-imposed sentences."[59]

Andrew understands that he has committed the most serious crime that an individual can commit, and will live with deep remorse for the rest of this life for taking the life of another human being. Furthermore, as the Court is well aware, we are now living in unprecedented and dangerous times due to COVID-19. This pandemic is life changing for all, and especially for incarcerated defendants like Andrew. Prisoners like Andrew are, by the very nature of incarceration, lack the ability to freely decide for themselves how they choose to avoid infection. Plainly, the jail decides if and when Andrew will socially distance from others, which correction officers, or other inmates he will associate with, or whether to associate with them at all, and how often to wash his own hands, and disinfect his own property.

By the same token, the very high-risk health crisis has caused each jail facility like MDC to implement regulations, like lockdowns, causing limited access to discovery and in person attorney-client access, and erratic remote client access. These major impediments only serve to further cripple defendants', like Andrew, by depriving them of the ability to effective representation and other fundamental constitutional rights.

For the last year, Andrew has been confined in pre-trial detention at the MDC, a pre-trial holding facility that is not designed for long-term stays. Even under the best of circumstances, inmates' movements are severely restricted at all times and they have little opportunity to participate in social programs, limited access to personal development

[59] *US v. Nesbeth*, 188 F.Supp.3d 179 (E.D.N.Y. May 24, 2016).

**CONCLUSION**

Mr. Done understands the seriousness of his offense and is deeply apologetic for his actions and remains especially remorseful to the Court. When Mr. Done's involvement in this offense is viewed against the backdrop of his personal history and characteristics, it is clear that the proposed sentence of 15 years imprisonment is both reasonable and appropriate. Mr. Done respectfully reserves the right to raise additional issues at the time of sentencing. The Court's time and consideration of this submission are greatly appreciated.

Respectfully submitted,

/s/

John A. Diaz, Esq.
Mark DeMarco, Esq.
Ana M. Toro-Greiner

*cc:* All Counsel (*via ECF*)