

**U.S. Department of Justice**

*United States Attorney*
*Southern District of New York*

*The Silvio J. Mollo Building*
*One Saint Andrew's Plaza*
*New York, New York 10007*

February 10, 2023

**<u>BY ECF</u>**
Honorable Jed S. Rakoff
United States District Court Judge
Southern District of New York
500 Pearl St.
New York, NY 10007

**Re: *United States* v. *Andrew Done*, 22 Cr. 192 (JSR)**

Dear Judge Rakoff:

The defendant in this case, Andrew Done, is scheduled to be sentenced on February 17, 2023 at 4:00 p.m. Done is being sentenced for the murder of Angel Barreiro and for being the leader of the violent street gang the "Shooting Boys." The stipulated Guidelines range is life imprisonment (the "Stipulated Guidelines Range"). As discussed in more detail below, a term of life imprisonment would not be an unreasonable sentence in light of the defendant's history of extreme violence and the callousness of the Barreiro murder. However, to the extent to the Court deems a downward variance appropriate, we submit that the seriousness of the offense requires a significant term of imprisonment—even if not a lifetime sentence. Accordingly. the Government respectfully submits that the sentence should be at least the 420-months-term recommended by the Probation Office, if not higher.

## I. Offense Conduct

### A. The Defendant Founds the "Shooting Boys"

The defendant was the leader and founder of a violent street gang that called itself the Shooting Boys. The defendant had been a member of the notorious Trinitarios gang, but formed the Shooting Boys as a breakaway offshoot of the Trinitarios in or about 2017. (PSR 36). The defendant recruited other disaffected Trinitarios members and created the gang in an effort to gain autonomy from the larger Trinitarios. (PSR ¶ 36). The break from the Trinitarios was a source of enmity between the two gangs which led to a series of violent clashes between them. Eventually, the Shooting Boys became entangled in violent disputes with other gangs as they attempted to establish themselves in areas controlled by these rival sets. The Shooting Boys' main source of income came from robberies and drug sales, namely, heroin, crack cocaine, cocaine, oxycodone, and marijuana. (PSR ¶¶ 2, 16, 20, 36, 37). Overseeing the entirety of the violence and drug dealing was Andrew Done, the defendant.

### B. The Defendant Personally Participated in the Gang's Violence

In fact, Done directed almost all of the gang's activities—activities that terrorized multiple neighborhoods in the Bronx and Manhattan. (PSR ¶ 33, p. 41). Under his leadership, the gang

committed countless acts of violence against members of rival gangs, as well as the public at large. They robbed rival drug dealers and ordinary citizens at gunpoint, and they distributed a deadly array of narcotics to the members of the communities in which they operated. (PSR ¶¶ 33-34). Nor was the defendant above taking part in the gang's violent activities himself. In fact, in a gang notorious for its violence, Done was easily the most violent of all.

Just one of many examples was his June 9, 2019 shooting at a rival drug dealer. The shooting arose out of a verbal dispute the defendant and other members of the Shooting Boys had with the rival dealer. (PSR ¶ 41). That drug dealer worked for his co-defendant Edwin Jimenez, who at the time was not yet associated with the Shooting Boys. (*Id.*) As the verbal dispute escalated into a physical altercation, Done used one of the gang's guns and to shoot at Jimenez and his worker. (PSR ¶ 42). Although Done missed his targets, the rival drug dealer returned fire, and an innocent bystander in a near-by park was caught in the crossfire—hit by one of the bullets. (*Id.*)

The defendant, however, did not always miss his mark. On June 23, 2019, just two weeks after the prior shooting, Done hatched a plan with several members of the Shooting Boys to go hunting for "ops" or rival gang members with the express intent of shooting them—and this time, Done did not miss his mark. (PSR ¶ 43). Done and three other Shooting Boys drove motorized scooters to chase down two members of a rival gang. Done, who was armed with a firearm, fired several shots at the two rivals, striking both. (*Id.*)

And another example: On July 6, 2020, Done organized a home invasion robbery of someone he and the gang suspected of being a drug dealer. (PSR ¶ 44). The defendant believed that a home in South Bound Brook, New Jersey was being used by the occupants as stash house for drugs and money. (*Id.*) Done and several other gang members forced their way into the home at night armed with at least one firearm. (*Id.*) Done personally interrogated one of the male occupants, demanding to know where the drugs and money were being stored. (*Id.*) When the victim, who was tied up during the interrogation, failed to respond in a manner the defendant found acceptable, Done and the others pistol whipped and beat the victim. (*Id.*)

### C. The Murder of Angel Barreiro

Done's penchant for violence reached its peak on November 5, 2020, when he murdered Angel Barreiro, a/k/a "Jay La Sombra." The unprovoked murder occurred on a busy street, in broad daylight, as Barreiro sat in his car, unable to escape. Done shot Barreiro multiple times simply because Barreiro said something that angered him. The entire episode was captured on several security camera videos. (*See* USAO_010134).[1] The videos captured the defendant leave his apartment, get into his car, drive to the scene of the murder, argue with Barreiro, and then shoot him multiple times while Barreiro was trapped in his car. (*Id.*) As the video shows, Done shot Barreiro multiple times through the open window of the passenger side of Barreiro's car. (*Id.*) But that was apparently not enough. In an attempt to make certain Barreiro was dead, Done then

[1] Attached to the Government's submission is the video recording bearing Bates number USAO_010134, which was provided the Court earlier today.

walked over to the driver's side window and shot him *again* at closer range. (*Id.*) Then Done got back into his car and drove back to his apartment taking the same route he traveled to the scene of the murder, apparently feeling no remorse at all. (*Id.*)





Shortly after the murder, Done learned—to his surprise—that surveillance cameras had recorded the shooting and fled to the Dominican Republic. He remained a fugitive in the Dominican Republic until his arrest in the instant case.

**D. Done's Leadership of the Shooting Boys**

The extent and reality of Done's gang activity is captured in a number of recorded jail calls and social media messages, in which he discusses crime and violence with his subordinates, many of whom were minors at the time. For example:

On December 14, 2019, Done spoke with Juan Gomez, a/k/a Enano," a minor who was incarcerated at Rikers Island at the time. Done and Gomez discussed various gang members and the status of their individual criminal cases. At one point during the conversation, Done told Gomez that he was going to pick up another gun. Done told Gomez that the 52nd precinct recently seized a gold and red gun. Done told Gomez that he had recently seen the leader of a rival gang, "Machete" and that Done wanted to hit Machete with everything he had.

On May 12, 2020, Ronald Urena, an associate of the Shooting Boys called Done from the Rikers Island Jail Facility. Done told Urena about how the police stopped him while he and other gang members were on their way to Brooklyn in a van to pick up drugs and that the police confiscated the van.

Similarly, the defendant's social media accounts contain numerous gang related communications with other members of the Shooting Boys in which they discuss their involvement in narcotics distribution and firearms possession. For example, on June 18, 2019, Done exchanged the following messages with fellow Shooting Boy, Juan Sosa Coste, a/k/a "Suave":

DONE: "What's up? When are you coming down? Do you have a connect for some Jordans (guns) over there because we are at war with everyone."

COSTE: "Yes, they are around. A friend of mine told me that for $250 you can snatch a dog" (get your hands on a gun).

DONE: "Please find out about that. We are having problems with everyone; Los Sures, 3MB, Sunset, Los Tequetes, El Klan, a whole bunch of gangs."

COSTE: How is that possible? You don't send them a gift?

DONE: "At the end of the day, we had to give those guys problems. They were showing off and wanted to treat us like suckers. You know the way they are. We showed them who we are the other day and we had to let a few (shots) go and we let a few (shots) go at them today too. And now they are around her like cats looking for mice but don't worry because we have that glue that is going to catch them for real."

On June 16, 2019, Done exchanged the following messages with fellow Shooting Boy member, Roberchyf Sanchez, a/k/a "Lil Rabia" via Facebook:

SANCHEZ: "But who is that guy? The one with the motorcycle?"

DONE: "I have no idea. He said he was Tribu (Trinitario) and he was with a few Tribus from Bad Boys, some Cappo guy, trying to act tough. But we had some Jordans (guns) and they were shitting on themselves. They asked us if we were going to shoot at them even though they were Tnt. I told them that we give problems even to the Tnt so get out of here and that the owner of the motorcycle was right there. It was Alacran and he was sitting on the bike."

(USAO_016374).

These are just some of the dozens of messages and conversations the defendant had in which he discussed the gang's criminal activities and the violent acts they committed. And, as with other members of the Shooting Boys, the defendant was eager to advertise his membership in the gang by posting photos of himself on social media with other gang members flashing gang signs, including forming his hand in the shape of pulling the trigger of a gun and posting the gang's initials "SB."

## II. Procedural History

On March 29, 2022, a grand jury in this district returned 22 Cr. 192 (JSR), a fifteen-count indictment (the "Indictment"), which charged the defendant in nine counts. Count One charged Done with racketeering conspiracy, in violation of Title 18, United States Code, Section 1962(d). Count Two charged the defendant with murder in aid of racketeering, in violation of Title 18, United States Code, Sections 1959(a), and 2. Count Three charged Done with murder through use of firearm, in violation of Title 18, United States Code, Sections 924(j), and 2. Count Four charged

the defendant with attempted murder and assault with a dangerous weapon in aid of racketeering, in violation of Title 18, United States Code, Sections 1959(a)(3), (a)(5), (a)(6), and 2. Counts Five, Thirteen, and Fifteen charged Done with firearms offenses, in violation of Title 18, United States Code, Sections 924(c), and 2. Count Twelve charged Done with assault with a deadly weapon in aid of racketeering, in violation of Title 18, United States Code, Sections 1959(a)(3), and 2, and Count Fourteen charged Done with narcotics conspiracy, in violation of Title 21, United States Code, Sections 841(b)(1)(A), and 846.

Done was apprehended by the United States Marshals Service in the Dominican Republic on April 8, 2022 after having fled there in early 2021. The defendant was presented before a Magistrate Judge in the Southern District of New York on April 11, 2022 and detained pending trial.

On November 17, 2022, the defendant pled guilty, pursuant to a plea agreement with the Government, to the racketeering conspiracy charged in Count One, in violation Title 18, United States Code, Section 1962(d). In connection with the plea, the defendant admitted to murdering Angel Barreiro. As a result of the murder, the stipulated Guidelines range is life imprisonment.

## III. The Presentence Report

On February 7, 2023, the Probation Department issued a revised Presentence Investigation Report and determined that under Chapters Two and Three of the Sentencing Guidelines, the defendant's total offense level is 43 and his Criminal History Category is II. (PSR ¶¶ 110-146). The Probation Office's calculation of the defendant's criminal history score included a two-point increase based on the fact that the defendant committed the instant offense while under a criminal justice sentence, namely, the term of probation he received due to his February 28, 2020 conviction for assault in the second degree. Probation calculated a Guidelines range of life imprisonment. (PSR p. 40). The Probation Office recommended a below-Guidelines sentence of 420 months' imprisonment.

## IV. Applicable Law

As has been recounted for the Court many times before in prior submissions and as the Court is keenly aware, the Sentencing Guidelines still provide strong guidance to sentencing courts following *United States v. Booker*, 543 U.S. 220 (2005), and *United States v. Crosby*, 397 F.3d 103 (2d Cir. 2005). Because the Guidelines are "the product of careful study based on extensive empirical evidence derived from the review of thousands of individual sentencing decisions," *Gall v. United States*, 128 S. Ct. 586, 594 (2007), district courts must treat the Guidelines as the "starting point and the initial benchmark" in sentencing proceedings. *Id.* at 596. After that calculation, however, the Court must consider the seven factors outlined in 18 U.S.C. § 3553(a), which include the nature and circumstances of the offense, the individual characteristics of the defendant, the need to adequately deter criminal conduct and promote respect for the law, and the need to provide restitution to victims. *Id.* at 50 & n.6.

## V. Discussion

### A. A Sentence of at Least 420 Months Is Appropriate in this Case

*Nature and Seriousness of the Offense*

The nature and circumstances of Done's conduct in this case require a significant sentence. Even putting aside his murder of Angel Barreiro, the defendant was not just a member, but the highest-ranking *leader* of a violent gang that terrorized neighborhoods in the Bronx and Manhattan. The name Done chose for his gang was not an accident—the Shooting Boys engaged in a level of gun violence that was high even in the violent world of New York street gangs.

Done made clear through his words and actions that he was – and was considered by his fellow gang members to be – the boss. When a rival drug dealer refused to comply with a directive of one of the Shooting Boys, the defendant did not hesitate to grab a gun and open fire, enforcing his will on the block. Two weeks later, when the defendant wanted to send a message to rival gang members, he once again grabbed a gun, confronted his enemies, and shot two of them. The pettiness of his motive is itself shocking—the rivals made the mistake of riding a motorcycle on the Shooting Boys' turf.

Done's conduct is made exponentially worse by his willingness to discharge firearms in the middle of the day on crowded Bronx streets. His repeated willingness to do so evinces a wanton disregard not just for the lives of his intended targets but the innocent bystanders who have the misfortune of being in the line of fire. In addition to the violent acts in which he personally participated, Done directed the use of guns and violence to protect the gang's drug territory and retaliate against rivals. Done was the one who purchased the gang's guns and decided which of the gang members had access to those guns. Much of the violent conduct his co-defendants are charged with was directed by Done and committed with guns the defendant provided. By way of example, the July 31, 2020 shooting which forms the basis for Counts Ten and Eleven charging co-defendant Moises Fontanez with attempted murder and assault with a dangerous weapon in aid of racketeering, was ordered by Done as an act of retaliation against rival gang members. However, Fontanez missed his target and hit an innocent bystander instead. This is just one example of the defendant's influence and control over the other gang members. Done's willful disregard for the lives and safety of other people—and his manipulation of others in causing them to execute violence for him—was extraordinary, and these facts alone warrant a lengthy sentence.

There is no clearer illustration of the defendant's dangerousness than his murder of Angel Barreiro. Barreiro apparently showed the defendant some form of disrespect, and the defendant's answer was to shoot him, multiple times, at point-blank range, and then shoot him again just to make sure he was dead. He did it in broad daylight, in a public area. He did it calmly and coolly. And he showed no remorse, but instead protected himself by fleeing to the Dominican Republic. These are the actions of an individual who is willing to kill at the drop of a hat for respect. Indeed, despite his best efforts, we are fortunate that his actions did not result in more deaths. In a gang known for violence, Andrew Done stood out and, if nothing else, his sentence should reflect that important fact.

The PSR notes the defendant has attempted to justify his decision to murder Barreiro. According to the PSR, the defendant alleges that he shot and killed Angel Barreiro because Barreiro had previously shot at the defendant and slashed him. (PSR at p. 41). Nothing in the record supports this assertion. There are no police reports that identify any shootings in which the defendant was the intended (or unintended) target, and there are no police or medical reports that suggest the defendant was ever slashed or even cut. No cooperating witness in this case—and there are several—has heard an inkling of this motive. To the contrary, some of them personally heard Done brag about the murder. Instead of taking responsibility for his actions that day, the defendant is now attempting to blame the victim. There is nothing in the video of the murder that indicates hostile or threatening actions on the part of the victim. In fact, it suggests just the opposite – Barreiro remained seated in the driver's seat of his car in the same position the defendant found him in when he arrived on the scene. (*See* USAO_010134). Barreiro made no movements or gestures that could be interpreted as aggressive or that would cause the defendant to fear for his safety. Rather, the defendant's default response to a remark he interpreted as disrespectful was to shoot and kill the person who made that remark. To be clear, the defendant was not just trying to injure Barreiro, Done's actions clearly demonstrate an intent to kill. Done's initial shots were fired from the passenger side of the vehicle, which appear to have struck the victim, as he can be seen falling back in his seat when the shots are fired. (*Id.* at 09:41:15). But, Done took the time to walk around to the other side of the vehicle, take aim, and fire again—this time from the driver's side after having already shot the victim. (*Id.* at 09:41:20). There can be no justification for these depraved actions.

To be clear, the defendant played an outsized role in transforming the neighborhoods in which the gang operated into what is best described as a warzone. And he did not accomplish this simply by being a member of a violent gang. He did so by personally picking up a gun and pulling the trigger over and over again.

Not to be overlooked is the fact that defendant ran a prolific drug operation that sold large quantities of dangerous narcotics all over the University Heights section of the Bronx. He organized robberies of rival drug dealers, determined who could sell in the group's territory, used the proceeds to purchase guns for the gang's use, and kept his community flooded with these dangerous and lethal drugs.

*Adequate Punishment, Protection of the Public, and Deterrence*

A significant sentence, in no event less than 420 months' imprisonment, is also needed to adequately punish the defendant, protect the public, and deter him from committing additional crimes of a similar nature – crimes the defendant has engaged in repeatedly over the last few years. Such a sentence would also promote respect for the law—goals that clearly were not accomplished by his previous sentence of probation. Looking beyond the defendant himself, there is a significant need for general deterrence—*i.e.*, for those gang members that remain at large in the community over whom the defendant held so much sway and who continue to engage in repeated cycles of violence and drug dealing. It is important for them to learn that such activity will not be tolerated and will result in a lengthy prison sentence if prosecuted in federal court.

**CONCLUSION**

For the reasons set forth above, the Government respectfully requests that the Court impose a sentence of at least 420 months' imprisonment, as recommended by Probation, if not higher.

Very truly yours,

DAMIAN WILLIAMS
United States Attorney

by: ______________________________
Dominic A. Gentile
Adam S. Hobson
James Ligtenberg
Assistant United States Attorneys
(212) 637-2567/2484/2665

cc: John Diaz, Esq. (Via ECF)
Mark DeMarco, Esq. (Via ECF)