```
N2M1DONS
```

1    UNITED STATES DISTRICT COURT
     SOUTHERN DISTRICT OF NEW YORK
2    ------------------------------x
3    UNITED STATES OF AMERICA,
4              v.                          22 Cr. 192 (JSR)
5    ANDREW DONE,
6                   Defendant.             Sentencing
     ------------------------------x
7
                                            New York, N.Y.
8                                           February 22, 2023
                                            12:06 p.m.
9
10   Before:
11                    HON. JED S. RAKOFF,
12                                          District Judge
13
                           APPEARANCES
14
     DAMIAN WILLIAMS
15        United States Attorney for the
          Southern District of New York
16   BY:  DOMINIC A. GENTILE, ESQ.
          JAMES A. LIGTENBERG, ESQ.
17        Assistant United States Attorneys

18   DIAZ & MOSKOWITZ PLLC
          Attorneys for Defendant
19   BY:  JOHN DIAZ, ESQ.

20   LAW OFFICE OF MARK S. DeMARCO
          Attorneys for Defendant
21   BY:  MARK S. DeMARCO, ESQ.

22   ALSO PRESENT:    WILLIAM COLEMAN, Paralegal Specialist, USAO
                      DAGOBERTO ORRANTIA, Interpreter (Spanish)
23                    ERIKA DE LOS RIOS, Interpreter (Spanish)

24

25

SOUTHERN DISTRICT REPORTERS, P.C.
                     (212) 805-0300

1       (Case called)

2       THE DEPUTY CLERK: Will everyone please be seated and
3  will the parties please identify themselves for the record.

4       MR. GENTILE: Good afternoon, your Honor. Dominic
5  Gentile and James Ligtenberg for the United States. Seated at
6  counsel table with us is Mr. Will Coleman, a paralegal with the
7  U.S. Attorney's Office.

8       THE COURT: I think the term of art is "paralegal
9  specialist."

10      MR. GENTILE: My mistake, your Honor.

11      I would also like to note for the Court that Ms. Lexie
12 Barreiro, the sister of the victim, is present in the audience
13 as well.

14      MR. DIAZ: Good afternoon, your Honor. John Diaz and
15 Mark DeMarco present for defendant Andrew Done, who is seated
16 to my right, your Honor.

17      THE COURT: Please be seated.

18      All right. We're here for sentencing. The first item
19 of business is to calculate the sentencing guidelines, which
20 are not binding on the Court but which the Court is required to
21 calculate. And the probation office says the total offense
22 level is 43, criminal history category II; therefore, a
23 guideline of life imprisonment. Any disagreement by the
24 government?

25      MR. GENTILE: No, your Honor.

1    THE COURT:  Any disagreement by the defense?

2    MR. DIAZ:  No, your Honor.

3    THE COURT:  So I will adopt that calculation and adopt
4 the presentence report.

5    And you've gone over the presentence report with your
6 client, yes?

7    MR. DIAZ:  Yes, your Honor.

8    THE COURT:  Very good.

9    All right.  So now let's turn to what is more
10 important, which is where the defendant should be sentenced
11 pursuant to Section 3553 of Title 18 of the United States Code.

12   So let me hear first from defense counsel, then from
13 government counsel, and then from the defendant, if he wishes
14 to be heard.

15   MR. DIAZ:  Thank you, your Honor.

16   Your Honor, firstly, Mr. Cohen is extremely apologetic
17 for his actions, for his role in this conduct, and is
18 specifically and particularly apologetic to the family of Angel
19 Barreiro, and he would like Angel Barreiro's family to know
20 that he is truly remorseful.  And I also, your Honor, would
21 like to extend my deepest sympathy to Mr. Barreiro's family.

22   Your Honor, Andrew Done is a young man who was in his
23 late teens at the time that this conspiracy began.  He has an
24 IQ of just 60, and has been suffering from schizophrenia since
25 he was a child.  Andrew understands, your Honor, that he

Case 1:22-cr-00192-JSR   Document 147   Filed 03/01/23   Page 4 of 20    4
N2M1DONS

committed a terrible crime and that he must be punished for it, and I submit that he took the important first step in his quest for redemption by pleading guilty in this case and accepting responsibility. The defense team submitted a very detailed submission with exhibits for the Court's consideration, and we did our best to provide the Court with as much information as we could and tried to provide some type of context to the Court for how we got here today.

THE COURT: That was very helpful, and I appreciate your submission.

MR. DIAZ: Thank you, your Honor.

And with that said, Judge, I'm not going to rehash all of those facts here on the record. But I do want to highlight a few factors that I think are most relevant in the Court's determination under 3553(a).

First, your Honor, as I mentioned, Andrew was a mere teenager when this conspiracy began. I believe the entire conspiracy encompassed a couple of years, and Andrew had just barely reached adulthood when this terrible murder was committed. And I know that the Court is aware of the studies that have been done showing the late development of the brain, part of the brain responsible for judgment and impulse control, and when we combine this, your Honor, with poverty, with neglect, with abuse, with schizophrenia, and an IQ of 60, I submit that we had certain conditions in place, your Honor,

SOUTHERN DISTRICT REPORTERS, P.C.
(212) 805-0300

that kind of brought us to where we are today.

In preparing for this, your Honor, my daughter came up to me recently and asked for some help on her English class. She was reading *The Outsiders*, and I just –– I found it so appropriate that she was reading that book.  And I remembered also the other companion book by S.E. Hinton, *Rumble Fish*.  And you know, I'm helping her, trying to, you know, come up with her assignment on the concepts of the book, and I thought about this case, your Honor, and I thought about the similarities that those young men encountered in 1950s Tulsa, Oklahoma, and what the young men were encountering in the Bronx in the year 2020, and how the presence of certain conditions in our community continue to lead to the same outcomes for so many young men.  And whether it's the Shooting Boys, the Trinitarios Sunset, the Bloods, or the Greasers, all these young men are lost in the same maze, with mentors and positive role models in short supply.

In addition, your Honor, I ask the Court to consider Andrew's mental illness and disability.  As we stated, Judge, he was diagnosed with schizophrenia at a young age.  He was subjected to excessive corporal punishment, given unprescribed psychotropic medication, and was even subjected to electroshock therapy as a child.  He has experienced mental health episodes requiring hospitalization and has had failed suicide attempts. Andrew began having hallucinations at the age of 11, and has

had inconsistent mental health treatment since 2016.  He spent his formative years being shuffled around between the Dominican Republic and the Bronx, on almost a yearly basis.  His education records reflect a young man who his teachers described as kind and polite but yet could not mask his struggles in school.  At the age of 14, Andrew was performing at a second-grade level.  He felt deep shame in being placed in special education classes, suffered constant bullying which resulted in him being the victim of several assaults.  All these factors combined contributed to him dropping out of school.  And once he was out of school, he lost the last bit of structure that he had in his life.  He began hanging out with his older brother, who coincidentally is sitting in Rikers Island awaiting trial on an unrelated murder case.  Andrew began using street drugs and hanging out with kids in the neighborhood.  The entire offense, Judge, encompassed, again, just several years, from when he was a late teen to him reaching adulthood.

I think it's noteworthy to note, your Honor, that since his incarceration, the MDC medical staff has done their own evaluation on Andrew and he's under the care of a psychiatrist now.  He continues to feel deep remorse over the killing of Mr. Barreiro and has spent time at MDC under suicide watch.  He's currently seeing a psychiatrist every 15 days, and he's taking three separate psychotropic medications, including

|  |  |
|---|---|
| 1 | Risperdal, which is a known medication to treat schizophrenia. |
| 2 | Since he's been under constant treatment and care at the MDC, |
| 3 | he has participated in every single program that was available |
| 4 | to him, earning numerous certificates, and we submitted those |
| 5 | to the Court.  He's the father of a young son who's currently |
| 6 | living in a New York City shelter with his girlfriend, |
| 7 | Ms. Henriquez, and she's here in court along with his mother |
| 8 | and his family.  And these are the people that are going to |
| 9 | serve as his support network upon his eventual release from |
| 10 | prison. |
| 11 |       As a result of his age, he doesn't have a lengthy work |
| 12 | history, Judge, but he has worked.  He has worked in |
| 13 | construction, and he aspires to be a long-distance truck |
| 14 | driver, Judge, particularly because he says he can be alone. |
| 15 |       In closing, your Honor, I want to reiterate my |
| 16 | remorse, Andrew's remorse to Mr. Barreiro's family, and I ask |
| 17 | the Court to consider a sentence of 15 years as being |
| 18 | appropriate but not more than necessary to accomplish the goals |
| 19 | set forth in 3553(a). |
| 20 |       And finally, your Honor, these arguments are not |
| 21 | exhaustive, and we would rely on our submission. |
| 22 |       THE COURT:  Thank you very much. |
| 23 |       Let me hear from the government. |
| 24 |       MR. GENTILE:  Thank you, your Honor. |
| 25 |       Before I begin my remarks, Judge, I just wanted to |

1 note for the Court that Ms. Barreiro would like to address the
2 Court.
3            THE COURT:  We'll hear from her right after you.
4            MR. GENTILE:  Okay.  Thank you, Judge.
5            As your Honor has heard time and time again throughout
6 this case, the Shooting Boys gang were a violent crew of young
7 men who terrorized various neighborhoods in the Bronx.  Andrew
8 Done is the leader of that violent crew, and he's not only the
9 leader, he's solely responsible for its creation.  The name the
10 Shooting Boys didn't come about by mistake.  The defendant gave
11 the gang that name, and he made sure that gang lived up to its
12 name.  All or most of the violent conduct that the Court has
13 heard about in this case, a vast majority of the narcotics
14 distribution the Court has heard about in this case, a vast
15 majority of the robberies, the despicable conduct that the
16 Court has heard about in this case, can in some way, shape, or
17 form be traced back to this defendant.  And to be clear, Judge,
18 this defendant wasn't a —— didn't just sit back and give orders
19 to other gang members, although that was part of his role.  He
20 was a hands-on leader.  He picked up a gun and, time and time
21 again, he used that gun to settle scores with gang rivals.  In
22 June of 2019, when a rival drug dealer refused to comply with
23 his directive to remove an article of clothing the defendant
24 found offensive, the defendant's default response was to shoot
25 at him.  Only two weeks later, the defendant rallied his

henchmen and went looking for someone to shoot, for the only —— for the no other reason than to lay claim that he shot at a rival gang member. And when the defendant and his cohorts found two individuals he believed were gang members, he shot them both. And I say believed, Judge, because there is really no evidence that the two people he shot were actually members of a rival gang or any gang whatsoever.

A year later, the defendant planned, organized, and executed a home invasion robbery in New Jersey. In the dead of night, the defendant and several of his gang members, including several of his co-defendants, broke into a home at night where there were two families residing. One of the families had small children. When the defendant broke in, he tied up one of the male occupants, a male he believed to be a drug dealer. He pistol whipped that individual until that individual gave up where he was hiding his drugs. The defendant and his co-defendants and cohorts stole the drugs, stole money, and stole two vehicles from the residence of that house.

But the defendant's penchant for violence, your Honor, escalated and culminated on November 5th of 2020, when the defendant shot and killed Angel Barreiro. And that entire incident was captured on security camera video. And with the Court's permission, we'd like to show a clip of that video for the Court so that the Court could see firsthand the callous and unprovoked nature of that act.

1                THE COURT:  Sure.
2                MR. GENTILE:  If I could just set up the scene for the
3    Court.  What we're looking at here is a security camera video
4    over 1365 Cromwell Avenue.  The black car that is parked
5    perpendicular to the street in the apron, driveway apron there,
6    is the victim's car, a black Acura.  The victim is sitting in
7    the driver's seat of that car.  At the top left of the screen,
8    you'll shortly see the defendant's blue Dodge Charger turn onto
9    the block from West 170th Street.  The car will stop, park, the
10   defendant will get out of the car, engage with people in this
11   RV, and then he'll engage with the victim.
12               (Video played)
13               MR. GENTILE:  Your Honor, Angel Barreiro was sitting
14   in his car the entire — during the entire encounter he had
15   with the defendant.  Nothing, nothing the victim did during
16   that episode justified being shot multiple times by Andrew
17   Done.  There was no aggression, no movement towards the
18   defendant; no weapons were found on the victim, no weapons were
19   found in his car.  He was shot in cold blood, defenseless.
20               The defendant's attempt to convince the Court in his
21   submission that he shot Barreiro because Barreiro had
22   previously shot at him or slashed him is nothing more than a
23   desperate and bald-faced attempt at blame shifting, and the
24   Court should reject it out of hand.  There was no evidence of
25   anything of that nature, and as we've represented to the Court,

1  on multiple occasions, the government has spoken with a number
2  of people that are close with the defendant, that know why the
3  defendant did this; not one of them told us about any prior
4  attempts on the defendant's life that were made by Barreiro.
5          One of the other reasons we wanted to show the Court
6  the video was to highlight the defendant's willful and
7  deliberate actions here.  The defendant wasn't just trying to
8  scare the victim.  He wasn't even just trying to injure the
9  victim.  He was trying to kill the victim.  And we know that
10 because after the defendant had shot the victim from the
11 passenger side of the vehicle, he calmly walked around to the
12 other side and shot him again.
13         Of all the egregious conduct the Court has heard about
14 in this case, the defendant's is by far the worst.  The taking
15 of a human life in such a cold and calculating manner deserves
16 the most serious punishment the Court can mete out.
17         With respect to defense counsel's reference to the
18 defendant's mental capacity, the defendant had the mental
19 capacity to commit all of these crimes, he had the mental
20 acuity to order all of these other gang members to commit all
21 of their crimes, and he had the mental acuity to flee after
22 this murder to the Dominican Republic.  He wasn't apprehended
23 until the United States Marshals apprehended him in the
24 Dominican Republic and brought him back to the United States.
25         For all of these reasons, your Honor, the government

respectfully requests that the Court impose a significant sentence of imprisonment, one in the upper range of the guidelines and at the very least of 35 years, Judge.  Thank you.

         THE COURT:  Thank you very much.

         I'll hear from the sister of the victim.

         MR. GENTILE:  Ms. Barreiro has requested to make her statement in Spanish, Judge, and to use the interpreter.

         THE COURT:  Yes.

         MS. BARREIRO:  (Through interpretation and in English)

         Hello.  Good afternoon.

         Good afternoon to the judge and to the jury.  And my name is Lexie Barreiro.  I'm Angel Barreiro's sister, okay? Let me tell you a little bit about my brother.  We arrived here seven years ago.  We were all okay until my brother met certain friends.  He was doing very well in school until he met those friends.  So to keep my story short, he never slept out of the home.  He was a good boy — responsible, educated, studious, sportsman.  We have trophies and medals ever since the time we came to this country.

         I came here to say that it is not fair what he is saying, that he has a mental problem.  He has a mental problem now, after he killed my brother?  Before that he didn't have no problem, right?  And his woman, she live in a shelter now? Because in 2020, when he killed my brother, she wasn't there.

Because I'm in a shelter, I know everything that happens.  And she was outside in the summer, and you cannot be outside —— if you're in a shelter, you cannot be outside after 9, right?  So now she's in a shelter, she go to the shelter to help him with this, not because she need that, right?  That's the first thing.

I can speak English but I want to talk in Spanish.

The second thing is, two years ago —— well, a year and a half ago, my brother tried to keep away from all of those bad friendships, because he had a little daughter who was 2 years old.  He moved to Connecticut to make a radical change in his life.  And I'm not saying anything that is not true because his wife is there.  She's right there.  We live with the mother of his wife, his siblings, and his daughter.  My mom's not here.  I have to tell you that my mother cannot do anything at all after my brother was killed.  She doesn't eat, she's always in the hospital, she's always getting blood transfusions.  She's always getting IVs.

My brother was only 20 years old.  There is no reason for him to have been murdered.  On the night before, the day before he murdered my brother, he had an argument with the best friend of my brother.  My brother defended him.  That's what the whole borough says.  My brother argued with this little young man who's sitting here.  And he was with other people.  Maybe they was not in the car, but all of these people knew

1  what he was going to do.  Yes.  Because they made up a song,
2  saying each one of the words on each line many times, they shot
3  him, what car he was in, the color of the car, right?  And I
4  don't know if they were saying, but there were quite a few
5  people who wrote to me for me to tell my dad to leave things
6  alone, that what happens on the street stays on the street.  I
7  didn't want to come here because I have a 2-year-old daughter,
8  and because I feel that something will happen because I'm here.
9  Yeah.  And I don't care 'cause that's my brother.  I'm not
10 scared.  Right?  He was a human, you know?  He was not an
11 animal, not an animal.  He was not a person who mistreated
12 anyone.  He was a good son.  A good brother.  He always
13 defending these people.  My brother is dead right now because
14 he was defending a friend of his.  The last words out of my
15 brother's head to this young man who's sitting here was, what
16 happens with "enano" is with me.  You feel me?  Like it's -- I
17 don't agree with him getting 15 years.  Why?  He did not kill
18 an animal.  He didn't kill a bird.  He killed a man who was 20
19 years old, who had a future, who was helping his daughter.  He
20 left a wife with a 2-year-old child alone.

21         And then he says something else that I am leaving out.
22 Three days after he killed my brother —— because he did kill my
23 brother —— I gave birth.  And she's there, right?  My daughter
24 is 2 years.  She didn't know my brother.  And she is exactly
25 like my brother.  She's exactly like my brother.  She got his

attitude, his color, everything, and she don't know my brother. She is not gonna see him. I'm not gonna see him no more 'cause he's not here. 'Cause he killed my brother. Right?

And that's not enough; 15 years is not enough. He said he's got a problem now, right? He has problems now, after he murdered him? Well, that's great. It's not only him but his people, the Shooting Boys, have threatened me through the social networks for me to not be here. That's one. For me to stop posting photos of my brother asking for justice. I pay my bills; you feel me? And that's stupid. I'm sorry for that word. There are companions of his who are outside who knew what he was going to do, for the simple reason that the way they threatened me, they knew information about what he did. And they posted too because they do that every little while. I have had to block several people and they write again. And they write to me again. My daughter was born three days later because one of them called me, threatening me. And my giving birth was before time —— and I have proof of that —— because they called me and asked me, oh, stop talking. Don't call no police. What happens on the street stays on the street. That's the phrase they use. I have nothing else to say. I just like to say something to you, the judge. Please deal with this. He did not murder an animal. He was a person. And my father is not here. It's just my sister-in-law and me and my daughter. My mother is in Santo Domingo awaiting the

1   sentencing.

2   We don't agree at all with him getting 15 years.  As a
3   minimum he deserves 40.  And I hope he doesn't get some sort of
4   device so that he can stay at home.  My daughter is going to be
5   with me.  She has nothing to do with that.  But the dad is a
6   murderer.  And it's true.  A lot of proof.

7   One other thing.  Before this case he had other cases,
8   did he not?  Did he have this mental problem that he has now,
9   with those other cases?

10   THE COURT:  So Ms. Barreiro, I fully understand what
11   you're saying, but I think we need to move to the sentence.
12   Thank you very much.

13   All right.  So unless defense counsel had anything
14   else he wanted to say, we'll hear from the defendant, if he
15   wishes to be heard.

16   THE DEFENDANT:  Good afternoon, your Honor.

17   I would like to apologize to the relative of Angel
18   Barreiro for this tragedy that I committed.  I would also like
19   to apologize to the Court and to your Honor for this tragedy
20   that I have committed.  I would like to be able to bring him
21   back to life or have him stand once again before his family, so
22   that he could give his children opportunities and a good
23   education.

24   I also would have liked his mother to be present here
25   today so that I could ask for her forgiveness.  I also want to

ask forgiveness of his sister for this tragedy.

THE COURT:  All right.  Thank you very much.

So let me start with the most obvious point, which is, from the standpoint of every single factor that Congress asks the Court to consider in Section 3553, almost all of them weigh heavily in distinguishing a murder from almost any other wrongful activity.  A murder must be punished.  It must be punished severely, if we call ourselves civilized people.  It is the most fundamental axiom of society that murder can never be tolerated.  And therefore, a sentence considerably more than 15 years must be imposed in this case.

You have seen both in this case and in many other cases, the tragedies to all concerned that arise from terrible upbringings, from the influence of gangs, and the entire complex of actors that bring people who might have led decent lives to become people who prey on others.  Those are not irrelevant, but it's a question of degree.  I also think it's relevant that young people don't have the same impulse control as older people, that people with a low IQ don't have the same control as more intelligent people.  And all of those factors weighed to a limited extent — they convince the Court that the Court should not totally write off this defendant by giving him a life sentence.  Because he is not without hope of redemption.  But that is a relatively minor factor in this case.  Everything that this defendant did suggests such a disregard for the most

elementary rules of civilized behavior that the only reasonable response is to say he must be punished and punished hard, if society and its rules and the basic precepts of civilization mean anything.

So weighing all those factors and all the factors under Section 3553, I think a sentence of 35 years is the right sentence. So 420 months. So the sentence of 35 years will be imposed, to be followed by five years of supervised release on terms I'll get to in a moment.

No fine will be imposed.

And I take it the government is not seeking forfeiture here?

MR. GENTILE: We are not, Judge.

THE COURT: There is a $100 mandatory special assessment that must be paid.

The terms of supervised release are:

First, the mandatory conditions that the defendant will not commit any other federal, state, or local crime;

That he will not unlawfully possess a controlled substance;

That he will, upon his release from prison, submit to one drug test within 15 days, to be followed by at least two periodic drug tests thereafter;

That he will cooperate in the collection of DNA.

There will also be imposed the standard conditions of

1  supervision 1 through 12.  They appear on the face of the
2  judgment and also will be gone over with the defendant by the
3  probation officer when the defendant reports to begin his
4  period of supervised release.
5          And finally, there are the special conditions:
6          The defendant will participate in an outpatient drug
7  and alcohol program under standard terms and conditions;
8          The defendant will provide the probation officer with
9  access to any requested financial information;
10         The defendant will participate in an outpatient mental
11 health treatment program under standard terms and conditions;
12         And that the defendant will not associate with or
13 interact in any way, including through social media websites,
14 with any gang members or associates, especially of the Shooting
15 Boys gang, and
16         That the defendant will be supervised by the district
17 of his residence.
18         Now before I advise the defendant of his right of
19 appeal, is there anything else that either counsel needs to
20 raise with the Court?  Anything from the government?
21         MR. GENTILE:  Yes, your Honor.  The government moves
22 to dismiss all open counts.
23         THE COURT:  That motion is granted.
24         MR. DIAZ:  No objection to that motion, Judge.
25         THE COURT:  So does defense counsel have any

1  recommendation that it wishes the Court to make with respect to
2  location of imprisonment?
3          MR. DIAZ:  Yes, your Honor.  If the Court can
4  recommend to BOP that he be housed as close to New York City as
5  possible so that he can be near his family, your Honor.
6          THE COURT:  I will certainly recommend that.  I can't
7  order it, but I will recommend it.
8          All right.  Mr. Done, you have a right to appeal this
9  sentence.  Do you understand that?
10          THE DEFENDANT:  Yes.
11          THE COURT:  And if you can't afford counsel for the
12  appeal, the Court will appoint one for you free of charge.  Do
13  you understand that?
14          THE DEFENDANT:  Yes.
15          THE COURT:  Very good.  That concludes the proceeding.
16          THE DEPUTY CLERK:  All rise.
17                              o0o